# EXHIBIT Q

# UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2015-CFPB-0023

|  |  |
|---|---|
| In the Matter of:<br><br>Portfolio Recovery Associates, LLC | )<br>)<br>)  **CONSENT ORDER**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

    The Consumer Financial Protection Bureau ("Bureau") has reviewed the practices

of Portfolio Recovery Associates, LLC ("Respondent") regarding its purchase of charged-

off consumer debts from original creditors and other debt buyers, and its subsequent

collection efforts including filing lawsuits against consumers, and has identified

violations of sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of

2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a)(1), and sections 807, 807(2)(A), 807(5), and

807(10) of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e,

1692e(5) and 1692(e)(10)).  Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563,

5565, the Bureau issues this Consent Order (Consent Order).

Page 1 of 60



**EXHIBIT**

**49**

POUNDS EX 0662

## I.

### Jurisdiction

1.     The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565 as well as under section 814(b) of the FDCPA, 15 U.S.C. § 1692l(b).

## II.

### Stipulation

2.     Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## III.

### DEFINITIONS

The following definitions must apply to this Consent Order:

3.     "Affidavit" means those affidavits, declarations, verifications, or any sworn statements that are used in Legal Collection.

Page 2 of 60

POUNDS EX 0663

4.    "Board" means the duly elected and acting Board of Directors of Respondent's parent company, PRA Group, Inc.

5.    "Charge-off" means the treatment of a receivable balance by a Creditor as a loss or expense because payment is unlikely.

6.    "Charge-off Balance" means the amount alleged due on an account receivable at the time of Charge-off.

7.    "Clearly and Prominently" means:

a. as to written information, written in a type size and location sufficient for an ordinary consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary consumer. If the information is contained in a multi-page print document, the disclosure appears on the first page;

b. as to information presented orally, spoken and disclosed in a volume, cadence and syntax sufficient for an ordinary consumer to hear and comprehend.

8.    "Consumer" means any natural person obligated or allegedly obligated to pay any Debt.

9.    "Creditor" means any person who was owed a Debt which was not in default at the time it was obtained by such person.

POUNDS EX 0664

10.     "Debt" means any obligation or alleged obligation of a Consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

11.     "Debt Collection Lawsuit" means any lawsuit filed by Respondent, or on behalf of Respondent by a Law Firm, against any Consumer for the purpose of collecting any Debt.

12.     "Effective Date" shall mean the date on which the Consent Order is issued.

13.     "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegee.

14.     "Law Firm" shall refer to those third-party law firms retained by Respondent for the purpose of conducting debt collection activities on Respondent's behalf, including litigation.

15.     "Legal Collection" means any collection efforts made by Respondent's internal legal department or a Law Firm to collect Respondent's Debt, including but not limited to sending letters on Law Firm letterhead and filing Debt Collection Lawsuits.

16.     "Original Account-Level Documentation" means:

    a.  any documentation that a Creditor, or that Creditor's agent (such as a servicer) provided to a Consumer about a Debt; or

Page 4 of 60

POUNDS EX 0665

b.   a complete transactional history of a Debt created

by a Creditor, or that Creditor's agent (such as a

servicer);or

c.   a copy of a judgment, awarded to a Creditor.

17.    "Portfolio" means a collection of Debt sold to Respondent in a single

transaction.

18.    "Related Consumer Action" shall mean a private action by or on behalf of

one or more consumers or an enforcement action by another government agency brought

against Respondent based on substantially the same facts as set forth in Section IV.

19.    "Relevant Time Period" means the period from July 21, 2011 to the

Effective Date.

20.    "Respondent" means Portfolio Recovery Associates, LLC and its successors

and assigns.

21.    "Restitution Eligible Consumer" means any Consumer who made a

payment, directly or indirectly, to Respondent:

a.      during the Relevant Time Period on judgments

obtained from Time-Barred Debt Collection Lawsuits ("Time-

Barred Debt Restitution"), or

Page 5 of 60

POUNDS EX 0666

    b.  between July 21, 2011 and July 17, 2014, within 60 days

     of receiving a call from PRA's Litigation Department and after

     agreeing to make a payment where (1) the Debt had not yet

     been placed with an attorney; and (2) the Consumer was not

     informed during the call that the Debt had not been reviewed

     by an attorney ("Litigation Department Calls Restitution").

22. "Seller" means any person that sells any Portfolio to Respondent.

23. "Time-Barred" when used to describe a Debt means any Debt that is beyond

an applicable statute of limitations for a Debt Collection Lawsuit.

**IV.**

**Bureau Findings and Conclusions**

The Bureau finds the following:

24. PRA is a debt purchaser and collector headquartered in Norfolk, VA. PRA is

one of the nation's largest buyers of defaulted loans, credit card accounts, car loans and

other debts, which it purchases from creditors at a substantial discount to the face value

of the debts. PRA has also purchased in the past from other debt buyers. It then attempts

to collect these debts.

25. PRA collected Debt related to consumer financial products or services.

Accordingly, PRA is a "covered person" as defined by the CFPA, 12 U.S.C. § 5481(6). *See

also* 12 U.S.C. § 5481(5) and (15)(A)(x). PRA is also a "debt collector" as defined in

Section 803(6) of the FDCPA. 15 U.S.C. § 1692a(6).

Page 6 of 60

POUNDS EX 0667

26.    In 2013, PRA purchased more than $4.7 billion of charged-off Debts from banks, consumer and auto finance companies, and retail merchant finance companies.

<u>PRA'S DEBT BUYING PRACTICES</u>

27.    Prior to PRA purchasing a Debt Portfolio, PRA typically receives an electronic file ("Sale File"), from the Seller that includes information about the Consumers and the Debts, including, but not limited to, name, address, social security number, as well as the current balance, contract interest rate, and dates of origination, last payment, and charge-off.

28.    PRA is aware that significant inaccuracies may exist in the Sale Files it purchases, including that some Debts' balances were not reduced by a consumer's subsequent payments. For instance, when a PRA senior manager raised a concern about the poor quality of sellers' balance information and asked how PRA can know actual balances owed if it does not receive information on post charge-off payments, PRA's Vice President for Collections responded, "We don't. 90% of our cases are default judgments. We show the judge the math and if no one disputes we get our judgment. Debtor has the right to defend and prove us wrong. If they show payments we've missed we amend the complaint."

29.    Language in PRA's purchase agreements puts PRA on notice that information in the Sale File might be inaccurate, incomplete, or otherwise unreliable. For example, a debt seller may have specifically disclaimed the accuracy of information in the Sale File, notified PRA that documentation is unavailable, or notified PRA that a

Page 7 of 60

POUNDS EX 0668

percentage of accounts in a portfolio are disputed or barred by the applicable statute of limitations. For example, a 2009 purchase agreement with one large bank explicitly stated that account balances are "approximate" and "may not reflect credits for payments made by or on behalf of the [consumer] prior to the cut-off date."

30.    The purchase agreements stated that PRA was purchasing the loans based on PRA's independent examination, study, inspection and knowledge of the loans. However, PRA did not routinely check the account information in the Sale Files it purchased against the original creditor's records before contacting consumers, even when it knew or should have known the Sale File contained unreliable information.

31.    Some of PRA's purchase agreements put limitations on the availability of account-level documents, thus putting PRA on notice that it may not be able to access account-level documentation on all accounts purchased that would enable it to perform proper due diligence on Sale Files whose accuracy PRA has reason to doubt, investigate consumer disputes, or prove its case in contested litigation. Limitations on the availability of account-level documents in PRA's contracts included:

    a.  notifying PRA that supporting documents may only be available for a percentage of the accounts, but not identifying which accounts lacked documentation;

    b.  charging PRA a fee for each supporting document it requested;

    c.  increasing the per-document fee after PRA requests a certain percentage of documents from that Debt Portfolio or requests documents after a certain

Page 8 of 60

POUNDS EX 0669

date (*e.g.*, $1 per document after year one, $5 per document after year two); or

    d.  prohibiting PRA from contacting the original creditor for information or supporting documents.

32.    A Seller's failure to provide media has never led PRA to terminate a contract or renegotiate its terms.

### PRA'S PRACTICES RELATED TO CONSUMER DISPUTES

33.    PRA did not monitor its portfolios of debts for accuracy. PRA relied primarily on consumer disputes to determine whether a portfolio was unreliable and would assume its accuracy unless consumers came forward with evidence of problems in material numbers. However, until March 2012, PRA did not even track consumer disputes by Seller to determine whether a particular portfolio of loans it purchased was unreliable.

34.    Prior to February 2013, PRA did not routinely request account-level documentation if a Consumer disputed the Debt in writing more than 30 days after PRA sent a notice of debt pursuant to section 809 of the FDCPA, 15 U.S.C. § 1692g. Rather, PRA's policy stated that "ordering documents will be at the discretion of the dispute department since it is not mandated that we order them" and that PRA was "under no obligation to investigate" the disputed debt's validity before continuing collection.

35.    PRA does not investigate oral disputes. If consumers do not put their oral disputes in writing within 14 days, PRA will continue to demand payment without

POUNDS EX 0670

determining the Debt's legitimacy.

36.    PRA did not alter its collection practices when collecting on Portfolios that it knew or should have known contained unreliable information. Consumers receiving collection attempts from PRA had no way of knowing that PRA had reason to suspect the accuracy of the information.

### PRA'S PRACTICES RELATED TO OBTAINING CONSENT TO COMPUTER DIAL CONSUMERS' CELL PHONES

37.    PRA representatives sometimes use a computer dialing system to place calls to phone numbers associated with PRA accounts.  Federal law prohibits using an auto-dialer to dial a Consumer's cell phone without that Consumer's express consent.

38.    For approximately a year, and ending in August 2013, PRA gained or attempted to gain consumers' consent by representing to Consumers that they can only prevent collection calls to their cell phones before 9 a.m. if they consent to receive computer dialing system calls on their cell phones. If a representative manually dials a Consumer's cell phone and reaches the Consumer, PRA's policy until August 2013 was to require the representative to ask for the Consumer's consent to add the cell phone number to the computer dialing system in return for preventing calls to the Consumer's cell phone before 9 a.m. PRA penalized representatives who failed to adhere to this policy.

39.    The FDCPA currently contains a provision prohibiting debt collectors from calling Consumers at an "unusual" or "inconvenient" time, presumed to be before 8 a.m. or after 9 p.m. local time. 15 U.S.C.§ 1692c.

POUNDS EX 0671

## PRA'S PRACTICES RELATED TO LEGAL COLLECTIONS

40.    PRA represented to Consumers expressly or by implication that their Debts have been selected for legal action based on a review by an attorney. In fact, PRA used a computerized scoring model to select Debts for Legal Collections. This scoring model selected approximately 4.5% of PRA's Debts for referral to Legal Collections. The 4.5% of Debts that entered this channel were the source of 28% of PRA's total collections revenue. PRA collected approximately $319 million through its legal collections channel in 2013 alone.

41.    Once PRA refers a Debt for Legal Collection, specialized collectors contact the Consumer and attempt to arrange a settlement of the Debt. In most instances, no attorney has reviewed these Debts prior to these settlement efforts.

42.    On numerous occasions, these collectors, who identify themselves as the Litigation Department, made statements to Consumers such as "[PRA] will move forward with [its] litigation process" unless the consumer makes a payment to "stop the lawsuit." When Consumers hesitated to accept the payment plan, the Litigation Department collectors on numerous occasions countered with statements such as "You know that this is the Litigation Department, right?" or stated that the purpose of the call is "to see if we can get this resolved without the matter going to court." Prior to July 17, 2014, Collectors from the Litigation Department did not disclose whether or not an attorney had reviewed the Consumer's Debt.

POUNDS EX 0672

43.    Despite repeated references to "litigation" during the legal collections process, PRA in numerous instances had not reviewed or decided whether to file suit at the time collectors make those statements.

## PRA'S LITIGATION PRACTICES

44.    PRA uses dozens of law firms across the country to file approximately 3,000 suits every week. Consumers respond to less than six percent of those actions. In 2012 alone, PRA's internal and external counsel filed over 160,000 Debt Collection Lawsuits in state and local courts.

45.    PRA's recovery rate for post-suit collections is three times larger than PRA's recovery rates from other collection channels.

46.    Over a three year period, PRA placed tens of thousands of Debts with Law Firms staffed by fewer than five attorneys. For example, PRA placed approximately 27,000 Debts with a New York law firm employing just three attorneys and 21,000 Debts with a North Carolina law firm employing only five attorneys. PRA does not set a limit on the number of Debts it will place with a Law Firm based on the number of attorneys employed by the firm.

47.    PRA did not require its Law Firms to review account-level documents prior to filing suit. PRA prohibited them from contacting the original creditor or debt sellers directly to request such documents. PRA does not review pleadings before outside counsel files them.

POUNDS EX 0673

48.    PRA did not inform its Law Firms when an original creditor or debtor has specifically disclaimed the accuracy or validity of the Debt, has notified PRA that documentation is unavailable for some Debts, or notified PRA that a percentage of Debts in a portfolio are disputed or barred by the applicable statute of limitations.

### PRA'S MISLEADING COLLECTION AFFIDAVITS

49.    In many jurisdictions, PRA has been able to obtain a settlement or a default judgment against a Consumer using an Affidavit as its only evidence. PRA also uses Affidavits as proof in contested matters.

50.    In Affidavits used to support PRA Debt Collection Lawsuits, PRA's affiants on many occasions represented that they have personal knowledge of original creditors' account-level documentation corroborating consumers' debts when in fact they did not. For example, PRA affiants testified:

    a.    "This affidavit is based upon my personal knowledge . . . and my review of . . . the business records transferred to Account Assignee from [Account Seller]";

    b.    "I am authorized to make the statements ... herein, and do so based upon a review of . . . account records transferred to Account Assignee from [Account Seller]";

Page 13 of 60

POUNDS EX 0674

c.   "According to the records transferred to the

Account Assignee from Account Seller, and

maintained in the ordinary course of business by

the Account Assignee, there was due and payable

from [Consumer] to the Account Seller the sum of

$[Debt] with respect to [account number], as of

[date of sale] with there being no known un-

credited payments, counterclaims or offsets against

the said debt as of the date of the sale."

51.    In numerous instances, affiants made the representations discussed in the

preceding paragraph after merely reviewing a computer screen containing the scant

information produced by Sellers in data files and not after a review of any account level

documents such as account applications, terms and conditions of contracts, payment

histories, monthly credit card statements, or charge slips.

52.    PRA's affiants on numerous occasions represented that the terms and

conditions document attached to the Affidavit specifically applied to the Consumer's

Debt.

53.    In fact, in numerous instances, the attached terms and conditions were

often generic and did not necessarily apply to the Consumer's Debt.

POUNDS EX 0675

54.     In numerous instances, PRA through its affiants represented directly or indirectly, expressly or by implication that they have knowledge of the content of an account agreement.

55.     In fact, in certain instances the affiants could not have such knowledge because in the same filings, PRA represented it was unable to locate the agreement the affiant would have to review to gain that knowledge.

## PRA'S COLLECTION OF TIME-BARRED DEBT

56.     PRA occasionally threatened or filed suit on Debt that was past the applicable statute of limitations.

57.     After learning that it had obtained judgments on Debts that were beyond the statute of limitations, PRA did not move to vacate these judgments or otherwise remediate those Debts that had already been reduced to judgment.

58.     In numerous instances from at least January 1, 2009 to March 1, 2012, PRA collected Time-Barred Debt by falsely representing that Consumers had a legally enforceable obligation to pay the Debt.

59.     In numerous instances prior to March 1, 2012, PRA sent letters containing time-limited settlement offers that failed to disclose that the debt it was collecting was too old for litigation. PRA's letters seeking to settle Time-Barred debt contained statements such as, "These savings won't last long . . . ," "CALL NOW to take advantage of these limited time offers," "Your first payment must be received NO LATER than . . . ," and "Your account will be considered 'Settled in Full' after your final payment is posted."

Page 15 of 60

POUNDS EX 0676

### Violations of the Consumer Financial Protection Act

60.   Covered persons are prohibited from engaging "in any unfair, deceptive, or abusive act or practice" in violation of the CFPA. 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

61.   Respondent is a "covered person" within the meaning of the CFPA, 12 U.S.C. § 5481(6).

62.   Respondent made numerous misrepresentations to Consumers in connection with attempting to collect Debts, a Consumer financial product or service.

### False or Unsubstantiated Representations About Owing a Debt, in Violation of the CFPA

63.   In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that Consumers owed Debts to Respondent with certain unpaid balances, interest rates, and payment due dates. Respondent further represented to Consumers directly or indirectly, expressly or by implication, that Respondent had a reasonable basis for representing that Consumers owed the claimed Debts to Respondent.

64.   In truth and in fact, in numerous instances the representations set forth in Paragraph 63 were false or were not substantiated at the time the representations were made, including but not limited to where:

POUNDS EX 0677

a.    Consumers disputed, challenged, or questioned the validity or

accuracy of the Debt and Respondent failed to review information that

would have been necessary to have a reasonable basis to continue collecting

on that Debt; or

b.    Respondent had knowledge or reason to believe, based on

contractual terms or past performance of accounts sold by a seller, that a

specific portfolio of accounts contained unreliable data, but Respondent

failed to obtain and review information that would have been necessary to

have a reasonable basis to collect on the Debt.

65.    The representations are material because they are likely to affect a

Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt

and are likely to mislead Consumers acting reasonably under the circumstances.

66.    The representations set forth in Paragraph 63 are false or misleading and

constitute deceptive acts or practices in violation of Sections 1031(a) and 1036(a) of the

CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

<u>Misrepresenting that PRA Intends to Prove the Debt,</u>
<u>If Contested, in Violation of the CFPA</u>

67.    In numerous instances during the Relevant Period, in connection with

collecting or attempting to collect Debt from Consumers through litigation or threats of

litigation, Respondent represented, directly or indirectly, expressly or by implication, that

PRA intends to prove its claims, if contested.

POUNDS EX 0678

68.    In truth and in fact, in numerous instances, Respondent did not intend to prove its claims, if contested.

69.    These representations are material because they are likely to affect a Consumer's choice or conduct regarding whether to pay the Debt or contest the lawsuit and are likely to mislead Consumers acting reasonably under the circumstances.

70.    The representations set forth in Paragraph 67 are false or misleading and constitute deceptive acts or practices in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

<u>Filing Misleading Collection Affidavits in Violation of the CFPA</u>

71.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, in Affidavits filed in courts across the country, Respondent represented directly or indirectly, expressly or by implication, that:

      a.    PRA affiants had reviewed account-level documentation from the original creditor corroborating the Consumer's Debt;

      b.    Documents attached to affidavits were specific to the Consumer; or

      c.    PRA affiants were familiar with the content of account agreements.

72.    In truth and in fact, in numerous instances:

      a.    PRA's affiants had not reviewed account-level documentation from the original creditor corroborating the Consumer's Debt;

      b.    Documentation attached to affidavits was not specific to the

Page 18 of 60

POUNDS EX 0679

Consumer; or

c.      PRA affiants were not familiar with the content of account agreements because, for example, the account agreements at issue were no longer available for affiants to review.

73.    These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a lawsuit and are likely to mislead Consumers acting reasonably under the circumstances.

74.    The representations set forth in Paragraph 71 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

Misrepresentations Regarding Time-Barred Debt, in Violation of the CFPA

75.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt that is beyond the applicable statute of limitations from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that Consumers had a legally enforceable obligation to pay the Debt.

76.    In truth and in fact, Consumers do not have a legally enforceable obligation to pay Debt that is beyond the applicable statute of limitations.

77.    These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt claim and are likely to mislead Consumers acting reasonably under the circumstances.

Page 19 of 60

POUNDS EX 0680

78.    The representations set forth in Paragraph 75 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Misrepresentations Regarding Attorney Review

79.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt, Respondent represented to Consumers, directly or indirectly, expressly or by implication, that an attorney has reviewed the Consumer's Debt or that the collector is calling on the attorney's behalf.

80.    In truth and in fact, an attorney had not reviewed the Consumer's Debt and the collector was not calling on behalf of an attorney.

81.    These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt and are likely to mislead consumers acting reasonably under the circumstances.

82.    The representations set forth in Paragraph 79 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Misrepresentations of Imminent Litigation

83.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt, Respondent represented to Consumers, directly or indirectly, expressly or by implication, that litigation was planned, imminent, or even underway.

POUNDS EX 0681

84.    In truth and in fact, litigation was not planned, imminent, or underway because PRA had not decided whether to file suit.

85.    These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt and are likely to mislead consumers acting reasonably under the circumstances.

86.    The representations set forth in Paragraph 83 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

<u>Misrepresentations about Computer Dialing System Calls</u>

87.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt, Respondent represented to Consumers, directly or indirectly, expressly or by implication, that consumers cannot prevent collection calls on their cell phones before 9 a.m. local time unless they consent to receiving computer dialing system calls on their cell phones.

88.    In truth and in fact, in numerous instances, consumers can prevent collections calls on their cell phones before 9 a.m. local time even if they do not consent to receiving computer dialing system calls on their cell phones. Under Section 805(a)(1) of the FDCPA, PRA is prohibited from calling consumers at any time PRA knows or should know is inconvenient to consumers. Consumers can simply tell PRA that it is inconvenient to call before 9 a.m. local time and PRA is prohibited from doing so. Further, absent information to the contrary, Section 805(a)(1) requires debt collectors to

Page 21 of 60

POUNDS EX 0682

assume that the convenient time for communicating with consumers is after 8 a.m. local time.

89.    These representations are material because they are likely to affect a consumer's choice or conduct regarding whether to provide consent to receive computer dialing system calls on a cell phone and are likely to mislead consumers acting reasonably under the circumstances.

90.    The representations set forth in Paragraph 87 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Violations of the Fair Debt Collection Practices Act

91.    Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any debt. Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A) specifically prohibits the false representations of the character, amount, or legal status of any debt. Section 807(5) of the FDCPA, 15 U.S.C. § 1692e(5) specifically prohibits the threat to take any action that cannot legally be taken or that is not intended to be taken. Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10), prohibits using false representations or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

92.    Respondent is a "debt collector" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6).

POUNDS EX 0683

93.    Respondent made numerous representations to consumers in connection with attempting to collect debts arising out of transactions primarily for personal, family, or household purposes.

### False or Unsubstantiated Representations About Owing a Debt, in Violation of the FDCPA

94.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that Consumers owed Debts to Respondent with certain unpaid balances, interest rates, and payment due dates. Respondent further represented to Consumers directly or indirectly, expressly or by implication, that Respondent had a reasonable basis for representing that Consumers owed the claimed Debts to Respondent.

95.    In truth and in fact, in numerous instances the representations set forth in Paragraph 94 were false or were not substantiated at the time the representations were made, including but not limited to where:

a.    Consumers disputed, challenged, or questioned the validity or accuracy of the Debt and Respondent failed to review information that would have been necessary to have a reasonable basis to continue collecting on that Debt; or

b.    Respondent had knowledge or reason to believe, based on contractual terms or past performance of accounts sold by a seller, that a specific portfolio of accounts contained unreliable data, but Respondent

Page 23 of 60

POUNDS EX 0684

failed to obtain and review information that would have been necessary to have a reasonable basis to collect on the account.

96.    The representations set forth in Paragraph 94 are false or misleading and constitute deceptive acts or practices in violation of Sections 807 and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

<u>Misrepresenting that PRA Intends to Prove the Debt,<br>If Contested, in Violation of the FDCPA</u>

97.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers through litigation or threats of litigation, Respondent represented, directly or indirectly, expressly or by implication, that PRA intends to prove its claims, if contested.

98.    In truth and in fact, in numerous instances, Respondent did not intend to prove its claims, if contested.

99.    The representations set forth in Paragraph 97 are false or misleading and constitute deceptive acts or practices in violation of Sections 807, 807(5), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(5), 1692e(10).

<u>Filing Misleading Collection Affidavits, in Violation of the FDCPA</u>

100.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, in affidavits filed in courts across the country, Respondent represented directly or indirectly, expressly or by implication, that:

Page 24 of 60

POUNDS EX 0685

    a.    PRA affiants had reviewed account-level documentation from the original creditor corroborating the consumer's debt;

    b.    Documents attached to affidavits were specific to the consumer; or

    c.    PRA affiants were familiar with the content of account agreements.

101.    In truth and in fact, in numerous instances:

    a.    PRA's affiants had not reviewed account-level documentation from the original creditor corroborating the consumer's debt;

    b.    Documentation attached to affidavits was not specific to the consumer; or

    c.    PRA affiants were not familiar with the content of account agreements because, for example, the account agreements at issue were no longer available for affiants to review.

102.    The representations set forth in Paragraph 100 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

<u>Misrepresentations Regarding Time-Barred Debt, in Violation of the FDCPA</u>

103.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt that is beyond the applicable statute of limitations from Consumers, PRA represented, directly or indirectly, expressly or by implication, that Consumers had a legally enforceable obligation to pay the Debt.

Page 25 of 60

POUNDS EX 0686

104.    In truth and in fact, Consumers do not have a legally enforceable obligation to pay Debt that is beyond the applicable statute of limitations.

105.    The representations set forth in Paragraph 103 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, 807(2)(A), 807(5), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(5), 1692e(10).

<u>Misrepresentations of Attorney Review</u>

106.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that an attorney has reviewed the Consumer's Debt or that the collector is calling on the attorney's behalf.

107.    In truth and in fact, an attorney had not reviewed the Consumer's Debt and the collector was not calling on behalf of an attorney.

108.    The representations set forth in Paragraph 106 are false or misleading and constitute a deceptive act or practice in violation of Sections 807 and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

<u>Misrepresentations of Imminent Litigation</u>

109.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that litigation is planned, imminent, or even underway.

POUNDS EX 0687

110.    In truth and fact, litigation was not planned, imminent, or underway because PRA had not decided whether to file suit.

111.    The representations set forth in Paragraph 109 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, 807(2)(A), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(10).

### Misrepresentations about Computer Dialing System Calls

112.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that consumers cannot prevent collection calls on their cell phones before 9 a.m. local time unless they consent to receive computer dialing system calls on their cell phones.

113.    In truth and in fact, in numerous instances, consumers can prevent collections calls on their cell phones before 9 a.m. local time even if they do not consent to receiving computer dialing system calls on their cell phones. Under Section 805(a)(1) of the FDCPA, PRA is prohibited from calling consumers at any time PRA knows or should know is inconvenient to consumers. Consumers can simply tell PRA that it is inconvenient to call before 9 a.m. local time and PRA is prohibited from doing so. Further, absent information to the contrary, Section 805(a)(1) requires debt collectors to assume that the convenient time for communicating with consumers is after 8 a.m. local time.

POUNDS EX 0688

114.     The representations set forth in Paragraph 112 are false or misleading and constitute a deceptive act or practice in violation of Sections 807 and 807(10) of the FDCPA, 15 U.S.C. § 1692e, 1692e(10).

## V.

## Conduct Provisions

IT IS ORDERED, under Sections 1053 and 1055 of the CFPA, that:

115.     Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate Sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1); and  Sections 807, 807(2)(A), 807(5), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692(5), 1692(8), and 1692(10).

## VI.

## PROHIBITION AGAINST COLLECTING DEBTS WITHOUT A REASONABLE BASIS

IT IS FURTHER ORDERED that Respondent, Respondent's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

116.     Making any representation, expressly or by implication, that a Consumer owes a Debt to Respondent or as to the amount of a Debt unless, at the time of making the representation, Respondent can substantiate the representation. Without limiting the

Page 28 of 60

POUNDS EX 0689

foregoing, such substantiation must include reviewing Original Account-Level Documentation reflecting the Consumer's name and the claimed amount excluding any post Charge-off or post-judgment payments (unless the claimed amount is higher than the Charge-off Balance or judgment balance, in which case Respondent must review (i) Original Account-Level Documentation reflecting the Charge-Off Balance or judgment balance and (ii) an explanation of how the claimed amount was calculated and why such increase in authorized by the agreement creating the Debt or permitted by law) under any of the following circumstances:

    a.  The Consumer disputed orally or in writing, the accuracy or validity of the Debt;

    b.  The Debt was purchased, after the Effective Date, through a purchase agreement without meaningful and effective representations and warranties as to the accuracy or validity of the Debt;

    c.  The Debt was purchased, after the Effective Date, through a purchase agreement without meaningful and effective commitments to provide Original Account-Level Documentation during the time period in which Respondent is collecting the Debt;

    d.  The Debt was purchased in a Portfolio, after the Effective Date, which Respondent knows includes unsupported or materially inaccurate information about any Debt, based on either of the following factors:

Page 29 of 60

POUNDS EX 0690

i.  At any time during the preceding twelve months, a Consumer disputed, orally or in writing, the accuracy or validity of a Debt in the Portfolio and Respondent sought but was unable to obtain Original Account-Level Documentation reflecting the amount of the Debt or the identity of the person responsible for the Debt, unless (i) Respondent can establish, based on a documented and thorough review of Original Account-Level Documentation concerning a sample of other Debts in the Portfolio, that the inability to obtain Original Account-Level Documentation to support the Debt in the Portfolio was an anomaly; or (ii) the inability to obtain Account-Level Documentation reflecting the amount of the Debt was caused by a documented balance adjustment made by a Creditor after Respondent acquired the Portfolio containing the Debt (for example, balance adjustments caused by a Creditor's audit or restitution);

ii.  Original Account-Level Documentation produced to Respondent, by a Seller or a Consumer, reflected information about the amount of the Debt or the identity of the person responsible for the Debt that was inconsistent and irreconcilable with information previously provided to

POUNDS EX 0691

Respondent by the seller, unless (i) Respondent can establish, based on a documented and thorough review of Original Account-Level Documentation concerning a sample of other Debts in the Portfolio, that the production of inaccurate or inconsistent information concerning the Debt in the Portfolio was an anomaly; or (ii) the inconsistency was caused by a documented balance adjustment made by a Creditor after Respondent acquired the Portfolio containing the Debt (for example, balance adjustments caused by a Creditor's audit or restitution).

117.    Notwithstanding the foregoing, Respondent is not required pursuant to this Paragraph to (i) refuse to accept any payments voluntarily submitted by Consumers; (ii) suspend collections for Consumers who have acknowledged the Debt and agreed to make payments; or (iii) refuse to communicate with a Consumer who affirmatively contacts Respondent (or Respondent's agents) or requests contact from Respondent (or Respondent's agents) to discuss the Consumer's Debt.

POUNDS EX 0692

## VII.

### PROHIBITION AGAINST SELLING DEBT

**IT IS FURTHER ORDERED** that Respondent, Respondent's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

118.    Reselling Debt to anyone other than (i) the entity that initially sold the Debt to Respondent or to the Creditor; (ii) to a subsidiary or affiliate of Respondent that is subject to the terms of this Consent Order (either by operation of law or by agreement); (iii) to any entity that is subject to the terms of this Consent Order as part of an acquisition or merger with Respondent, or purchase of all or substantially all of Respondent's assets; or (iv) Respondent's (or its affiliates') creditors or any agent of such creditors (in each case, solely in their capacity as such) in settlement or satisfaction of any claims under, or in connection with the default or remedial provisions of, any relevant loan or lending agreement.

## VIII.

### PROHIBITION AGAINST THREATENING OR FILING COLLECTION LAWSUITS WITHOUT AN INTENT TO PROVE THE DEBT, IF CONTESTED

**IT IS FURTHER ORDERED** that Respondent, Respondent's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

POUNDS EX 0693

119.   Initiating any Debt Collection Lawsuit unless in possession of the following:

a.   Original Account-Level Documentation reflecting, at a minimum, the
Consumer's name, the last four digits of the account number associated
with the Debt at the time of Charge-off, the claimed amount excluding any
post Charge-off payments (unless the claimed amount is higher than the
Charge-off Balance or judgement balance, in which case Respondent must
possess (i) Original Account-Level Documentation reflecting the Charge-off
Balance and (ii) an explanation of how the claimed amount was calculated
and why such increase is authorized by the agreement creating the Debt or
permitted by law), and, if Respondent is suing under a breach of contract
theory, the contractual terms and conditions applicable to the Debt;

b.   A chronological listing of the names of all prior owners of the Debt and the
date of each transfer of ownership of the Debt, beginning with the name of
the Creditor at the time of Charge-off;

c.   A certified or other properly authenticated copy of each bill of
sale or other document evidencing the transfer of ownership
of the Debt at the time of Charge-off to each successive owner,
including Respondent. Each of the bills of sale or other
documents evidencing the transfer of ownership of the Debt
must include a specific reference to the particular Debt being
collected upon, which can be done by referencing an exhibit

Page 33 of 60

attached to each bill of sale or other document transferring

ownership of the Debt that is represented or warranted by a

Seller to be a list all Debts acquired in that Portfolio; and

d.       Any one of the following:

    i.       A document signed by the Consumer evidencing the opening

of the account forming the basis for the Debt; or

    ii.      Original Account-Level Documentation reflecting a purchase,

payment, or other actual use of account by the Consumer.

120.    Engaging in any Legal Collection without providing the Consumer with certain information about the Debt, unless previously provided, including but not limited to, the following information:

a.   the name of the Creditor at the time of Charge-off, including the name under which that Creditor did business with the Consumer;

b.   the last four digits of the account number associated with the Debt at the time of Consumer's last monthly account statement, or if not available, at the time of Charge-off;

c.   the Charge-off Balance;

d.   Respondent's method of calculating any amount claimed in excess of the Charge-off Balance; and

POUNDS EX 0695

e.  a statement that the Consumer may request, in writing, copies of the documentation referenced in Paragraph 119 and Respondent or Respondent's agent will, within 30 days of such request, provide the documentation at no cost.

## IX.

## PROHIBITION AGAINST FILING FALSE OR MISLEADING AFFIDAVITS

**IT IS FURTHER ORDERED** that in connection with any lawsuit to collect a Debt, Respondent, Respondent's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

121.  Submitting any Affidavit:

   a.  In which the affiant represents, expressly or by implication, that the Affidavit has been notarized if the Affidavit was not executed in the presence of a notary;

   b.  Containing an inaccurate statement, including but not limited to a statement that attached documentation relates to the specific Consumer being sued when that is not the case;

POUNDS EX 0696

  c. In which the affiant represents, expressly or by implication, that any attached or unattached documents or records concerning the Debt forming the basis for the lawsuit have been reviewed by the affiant, when that is not the case; or

  d. In which the affiant represents, expressly or by implication, that the affiant has personally reviewed the Affidavit, when that is not the case.

## X.

## PROHIBITION AGAINST FALSE OR MISLEADING REPRESENTATIONS

**IT IS FURTHER ORDERED** that, in connection with the collection of debt, Respondent, Respondent's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

 122. Making any material misrepresentation or omission or assisting others in making any material misrepresentation or omission, expressly or by implication, including but not limited to misrepresentations:

Page 36 of 60

POUNDS EX 0697

a. To obtain a Consumer's consent to receive calls from a computer dialing system, including but not limited to, representations that the only means by which a Consumer can avoid collection calls during certain time periods is through consent to receiving calls to his or her cell phone.

b. That an attorney has reviewed a Consumer's Debt, where an attorney has not done so;

c. That a Debt Collection Lawsuit has been filed against the Consumer, where a Debt Collection Lawsuit has not been filed previously;

d. That a Debt Collection Lawsuit may be filed against the Consumer unless a payment is received, where an attorney has not previously reviewed and approved the Debt for suit.

123.    Using its "Litigation Department" or any similarly named office or group to collect or attempt to collect a Debt through solicitation, including but not limited phone calls or through writing, unless:

a. An attorney has personally reviewed the Debt; or

b. The solicitation or writing Clearly and Prominently discloses that no attorney has reviewed the Debt when in fact an attorney has not done so.

124.    Using outside Law Firms to collect or attempt to collect a Debt, through solicitation including but not limited to phone calls or through writing, unless

a. An attorney has personally reviewed the Debt; or

POUNDS EX 0698

b.  The solicitation or writing Clearly and Prominently discloses that no attorney has reviewed the Debt when in fact an attorney has not done so.

## XI.

## PROHIBITION AGAINST DECEPTIVELY COLLECTING TIME-BARRED DEBT

**IT IS FURTHER ORDERED** that Respondent, Respondent's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

125.  Collecting or attempting to collect any Time-Barred Debt through litigation or arbitration.

126.  Collecting or attempting to collect any Time-Barred Debt through any means, including but not limited to telephone calls and written communications without Clearly and Prominently disclosing to the Consumer:

a.  For those Time-Barred Debts that generally cannot be included in a consumer report under the provisions of the FCRA, 15 U.S.C. § 1681c(a), but can be collected through other means pursuant to applicable state law, Respondent will include the following statement: "The law limits how long you can be sued on a debt and how long a debt can appear on your credit report. Due to the age of this debt, we will not sue you for it or report payment or non-payment of it to a credit bureau;" and

POUNDS EX 0699

b.  For those Time-Barred Debts that can be collected through other means
    pursuant to applicable state law, and may be included in a consumer report
    under the provisions of the FCRA, 15 U.S.C. § 1681c(a), Respondent will include
    the following statement: "The law limits how long you can be sued on a debt.
    Because of the age of your debt, we will not sue you for it. "

127.    Making any representation or statement, or taking any other action that
interferes with, detracts from, contradicts, or otherwise undermines the disclosures
required in Paragraph 126 of this section.

128.    Respondent will be deemed to have complied with the disclosure
requirements of Paragraph 126 if it makes a disclosure to Consumers in a specific
jurisdiction that (1) is required by the laws or regulations of that jurisdiction, (2) complies
with those laws or regulations, and (3) is substantially similar to the disclosure required
by Paragraph 126.

## XII.

## COMPLIANCE PLAN

129.    Within 60 days from the Effective Date, Respondent must submit to the
Enforcement Director for review and determination of non-objection a comprehensive
compliance plan designed to ensure that Respondent's Debt collection practices comply
with all applicable Federal consumer financial laws and the terms of this Consent Order
(Compliance Plan). The Compliance Plan must include, at a minimum

POUNDS EX 0700

a.      Comprehensive, written policies and procedures designed to prevent violations of applicable Federal consumer financial protection laws and prevent associated risks of harm to consumers;

b.      Comprehensive, written policies and procedures designed to ensure that Respondent conducts due diligence regarding the accuracy of the information it acquires from Creditors;

c.      Comprehensive, written policies and procedures designed to insure that Law Firms engaged by Respondent to collect Debt do not violate any applicable Federal consumer financial protection laws that must include at a minimum:

   i. An analysis to be conducted by Respondent, prior to Respondent entering into a contract with the Law Firm, of the ability of the Law Firm to perform its obligations in compliance with all applicable Federal consumer financial laws and Respondent's related policies and procedures;

   ii. For new and renewed contracts, a written contract between the Respondent and the Law Firm, which sets forth the responsibilities of each party, including:

      1.      the Law Firm's specific performance responsibilities and duty to maintain adequate internal controls;

Page 40 of 60

POUNDS EX 0701

2.    the Law Firm's duty to provide adequate training on compliance with all applicable Federal consumer financial laws and Respondent's related policies and procedures;

3.    the Law Firm's duty to alert Respondent whenever a Consumer submits an oral or written dispute or asserts a defense to a Debt Collection Lawsuit, including but not limited to a dispute concerning the accuracy or validity of the Debt or any assertion that the Debt was Time-Bared;

4.    Respondent's authority to conduct periodic onsite reviews of the Law Firm's controls, performance, and information systems related to Debt collection on behalf of Respondent; and

5.    Respondent's right to terminate the contract if the Law Firm materially fails to comply with the terms specified in the contract, including the terms required by this Paragraph; and

iii.    Periodic review by Respondent of Law Firm's controls, performance, and information systems related to Debt Collections.

POUNDS EX 0702

d.    An effective training program that includes regular, specific, comprehensive training in consumer protection laws commensurate with individual job functions and duties for appropriate employees, including all employees having responsibilities that relate to consumer protection laws, senior management and the Board;

e.    An enhanced and well-documented internal risk-focused monitoring process incorporated into the daily work of Respondent's employees that is designed to detect and promptly correct compliance weaknesses of the Respondent and its service providers, particularly weaknesses that impact Consumers;

f.    An effective consumer complaint monitoring process, including the maintenance of adequate records of all written, oral, or electronic complaints from Consumers or inquiries, formal or informal, received by Respondent and its service providers and the resolution of the complaints and inquiries; and

g.    Effective independent audit coverage of the Compliance Program and Respondent's compliance with all Federal consumer protection laws and internal policies and procedures.

POUNDS EX 0703

130.    The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. In the event that the Enforcement Director directs Respondent to revise the Compliance Plan, Respondent must make the revisions and resubmit the Compliance Plan to the Enforcement Director within 30 days.

131.    After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

132.    Notwithstanding the foregoing, Respondent must take whatever steps necessary to fully implement all of the requirements and restrictions described in Paragraphs 116 and 119-120 within 180 days of the Effective Date and all of the requirements and restrictions described in Paragraphs 121 and 125-128 within 90 days of the Effective Date.

## XIII.

### ROLE OF THE BOARD

**IT IS FURTHER ORDERED that:**

133.    The Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

Page 43 of 60

POUNDS EX 0704

134.    Although this Consent Order requires Respondent to submit certain documents for the review or non-objection by the Enforcement Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with applicable Federal consumer financial law and this Consent Order.

135.    In each instance that this Consent Order required the Board to ensure adherence to, or undertake to perform certain obligations of Respondent, the Board must:

a.    Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

b.    Require timely reporting by management to the Board on the status of compliance obligations to be taken under the terms of this Consent Order; and

c.    Require timely and appropriate corrective action to remedy any material non-compliance with and any failures to comply with Board directives related to this Section.

## XIV.

## ORDER TO PAY REDRESS

**IT IS ORDERED** that:

136.    Within 10 days of the Effective Date, Respondent must reserve or deposit into a segregated deposit account an amount not less than $19,045,443 for the purpose of providing redress to Restitution Eligible Consumers as required by this Consent Order.

Page 44 of 60

POUNDS EX 0705

137.    For the 837 Restitution Eligible Consumers eligible for Time-Barred Debt Restitution, Respondent must provide full restitution, expected to total approximately $860,607, of all payments made, directly or indirectly, during the Relevant Time Period.

138.    For the 38,246 Restitution Eligible Consumers eligible for Litigation Department Calls Restitution, Respondent must refund all such payments, expected to total approximately $18,184,836, made between July 21, 2011 and July 17, 2014.

139.    For the judgments obtained during the Relevant Time Period from Time-Barred Debt Collection Lawsuits that have yet to be paid, expected to total approximately $3,411,094, Respondent must within 90 days of the Effective Date:

 a.    Withdraw, dismiss, or terminate all pending Time-Barred Debt Collection Lawsuits;

 b.    Release or move to vacate all judgments obtained during the Relevant Period in Time-Barred Debt Collection Lawsuits;

 c.    Cease post-judgment enforcement activities and cease accepting settlement payments related to any Time-Barred Debt Collection Lawsuit;

 d.    Request that the consumer reporting agencies amend, delete, or suppress information regarding any Time-Barred Debt Collection Lawsuits, and associated judgments, as applicable.

### Redress Plan

140.    Within 30 days of the Effective Date, Respondent must submit to the Enforcement Director for review and non-objection a comprehensive written plan for

POUNDS EX 0706

providing redress consistent with this Consent Order ("Redress Plan"). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Redress Plan, Respondent must make the revisions and resubmit the Redress Plan to the Enforcement Director within 30 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes set forth in the Redress Plan.

141. With respect to redress paid to Restitution Eligible Consumers, the Redress Plan must include: (1) the form of the letters ("Redress Notification Letters") to be sent notifying Restitution Eligible Consumers of the redress; and (2) the form of the envelope that will contain the Redress Notification Letter. The Redress Notification Letter sent to Restitution Eligible Consumers receiving Time-Barred Debt Restitution must include language explaining the manner in which the amount of redress was calculated; a statement that the provision of the refund payment is in accordance with the terms of this Consent Order; and a statement that accepting payment of redress will not subject the Consumer to any new Debt collection or credit reporting activities for that Debt. The Redress Notification Letters sent to Restitution Eligible Consumers receiving Litigation Department Calls Restitution must include language explaining the manner in which the amount of redress was calculated; a statement that the provision of the refund payment is in accordance with the terms of this Consent Order; and may include a statement that

POUNDS EX 0707

Respondent is not waiving its right to collect the remaining amount of the Debt, if any, in excess of any refund payment made under this Consent Order. Respondent must not include in any envelope containing a "Redress Notification Letter" any materials other than the approved letters and redress checks, unless Respondent has obtained written confirmation from the Enforcement Director that the Bureau does not object to the inclusion of such additional materials.

142.    The Redress Plan must include a description of the following:

a.    methods used and the time necessary to compile a list of potential Restitution Eligible Consumers;

b.    methods used to calculate the amount of redress to be paid to each Restitution Eligible Consumers as required herein;

c.    procedures for issuance and tracking of redress to Restitution Eligible Consumers;

d.    methods and procedures used and the time necessary to withdraw, dismiss, move to vacate, terminate, or release the Time-Barred Debt Collection Lawsuits and associated judgments, or to cease enforcement activities on Time-Barred Debt Collection Lawsuit judgments;

e.    procedures for monitoring compliance with the Redress Plan

f.    the process for providing restitution for Restitution Eligible Consumers, which shall include the following requirements:

i.Respondent must mail a check to any Restitution Eligible Consumer along

Page 47 of 60

POUNDS EX 0708

with a Redress Notification Letter;

ii.Respondent must send the check by United States Postal Service first-class mail, address correction service requested, to the Restitution Eligible Consumer's last known address as maintained by Respondent's records.

iii.Respondent must make reasonable attempts to obtain a current address for any Restitution Eligible Consumer whose Redress Notification Letter and/or restitution check is returned for any reason, using the National Change of Address System, and must promptly re-mail all returned letters and/or restitution checks to current addresses, if any. If the check for any Restitution Eligible Consumer is returned to Respondent after such second mailing by Respondent, or if a current mailing address cannot be identified using National Change of Address System, Respondent must retain the restitution amount of such Restitution Eligible Consumer for a period of three-hundred sixty (360) days from the date the restitution check was originally mailed, during which period such amount may be claimed by such Restitution Eligible Consumer upon appropriate proof of identity. After such time these monies will be deposited into the U.S. Treasury as disgorgement.

143.   The Redress Plan shall allow for a reduction in the amount of any payments previously refunded to a Restitution Eligible Customer by Respondent prior to the Effective Date.

POUNDS EX 0709

144.    If Respondent claims to have made any restitution prior to the Effective Date of this Consent Order that complies with the requirements of this Consent Order, Respondent must provide appropriate proof of such restitution to the Enforcement Director.

145.    After completing the Redress Plan, if the amount of redress provided to Restitution Eligible Consumers is less than $19,045,443, within 30 days of the completion of the Redress Plan, Respondent must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the difference between the amount of redress provided to Restitution Eligible Consumers and $19,045,443.

146.    The Bureau may use these remaining funds to pay additional redress to Restitution Eligible Consumers. If the Bureau determines, in its sole discretion, that additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury as disgorgement. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

147.    Respondent must not condition the payment of any redress to any Restitution Eligible Consumer under this Consent Order on that person's agreement to any condition, such as the waiver of any right.

**Assessment of Redress**

148.    Respondent must retain at its own expense the services of an independent

Page 49 of 60

POUNDS EX 0710

certified accounting firm ("Firm"), within 15 days after the Enforcement Director's non-objection pursuant to Paragraph 140, to determine compliance with the Redress Plan. The Firm shall determine compliance in accordance with the attestation standards established by the American Institute of Certified Public Accountants for agreed-upon procedures for engagements.

149. Prior to engagement, and no later than 60 days from the Effective Date, Respondent must submit the name and qualifications of the Firm, together with the proposed engagement letter with the Firm and the proposed agreed-upon procedures, to the Enforcement Director for non-objection. Within 15 days after submission of the Firm's name, the Enforcement Director must notify Respondent in writing of the Bureau's objection or non-objection thereto.

150. The Firm must prepare a detailed written report of its assessment of Respondent's compliance with the terms of the Redress Plan ("Restitution Report"). The Restitution Report must include an assessment of the Redress Plan and the methodology used to determine the population of Eligible Consumers, the amount of redress for each Restitution Eligible Consumer, the procedures used to issue and track redress payments, and the work of any independent consultants that Respondent has used to assist and review its execution of the Redress Plan.

151. The Firm must submit the Restitution Report to the Enforcement Director and the Board within 90 days after Respondent completes implementation of the Redress Plan.

POUNDS EX 0711

# XV.

## ORDER TO PAY CIVIL MONEY PENALTIES

**IT IS FURTHER ORDERED that:**

152.    Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law alleged in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $8,000,000 to the Bureau.

153.    Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

154.    The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

155.    Respondent must treat the civil money penalty paid under this Consent Order as a penalty paid to the government for all purposes.  Regardless of how the Bureau ultimately uses those funds, Respondent must not:

      a.      Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty that Respondent pays under this Consent Order; or

      b.      Seek or accept, directly or indirectly, reimbursement or

Page 51 of 60

POUNDS EX 0712

indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

156.    To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action, because of the civil money penalty paid in this action ("Penalty Offset"). If the court in any Related Consumer Action grants such a Penalty Offset, Respondent must, within 30 days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## XVI.

## ADDITIONAL MONETARY PROVISIONS

157.    In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

158.    Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to

Page 52 of 60

POUNDS EX 0713

Respondent.

159.    Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must

furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes

of collecting and reporting on any delinquent amount arising out of this Consent Order.

160.    Within 30 days of the entry of a final judgment, consent order, or

settlement in a Related Consumer Action, Respondent must notify the Enforcement

Director of the final judgment, consent order, or settlement in writing. That notification

must indicate the amount of redress, if any, that Respondent paid or is required to pay to

Consumers and describe the Consumers or classes of Consumers to whom that redress

has been or will be paid.

## XVII.

## REPORTING REQUIREMENTS

161.    Respondent must notify the Bureau of any development that may affect

compliance obligations arising under this Consent Order, including but not limited to, a

dissolution, assignment, sale, merger, or other action that would result in the emergence

of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate

that engages in any acts or practices subject to this Consent Order; any default under a

lending agreement under Section VII, Paragraph 118(iv); the filing of any bankruptcy or

insolvency proceeding by or against Respondent; or a change in Respondent's name or

address. Respondent must provide this notice at least 30 days before the development or

as soon as practicable after the learning about the development, whichever is sooner.

Page 53 of 60

POUNDS EX 0714

162.    Within 90 days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report), which has been approved by the Board, which, at a minimum:

a.    Describes in detail the manner and form in which Respondent has complied with this Consent Order; and

b.    Attaches a copy of each Consent Order acknowledgment obtained under Section XVIII of this Order, unless previously submitted to the Bureau.

## XVIII.

## ORDER DISTRIBUTION AND ACKNOWLEDGEMENT

**IT IS FURTHER ORDERED** that:

163.    Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and each executive officer, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Order.

164.    For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure as set forth in Section XVII, any future board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

Page 54 of 60

POUNDS EX 0715

165. Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 et seq., within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

## XX.

### RECORD KEEPING

**IT IS FURTHER ORDERED** that:

166. Respondent must create, for at least 5 years from the Effective Date, the following business records:

a. All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau; and

b. All documents and records pertaining to the Redress Program, as set forth in Section XIV above.

167. Respondent must retain the documents identified in Paragraph 166 for at least 5 years.

168. Respondent must make the documents identified in Paragraph 166 available to the Bureau upon the Bureau's request.

## XX.

### NOTICES

169. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this

Page 55 of 60

POUNDS EX 0716

Consent Order in writing, with the subject line, "In re Portfolio Recovery Associates, File

No. 2015-CFPB –[Docket #] and send them:

    a.      By overnight courier (not the U.S. Postal Service), as follows:

Assistant Director for Enforcement
Consumer Financial Protection Bureau
ATTENTION: Office of Enforcement
1625 I Street, N.W.
Washington D.C. 20006; or

    b.      By U.S. first-class mail to the below address and contemporaneously by

email to Enforcement_Compliance@cfpb.gov:

Assistant Director for Enforcement
Consumer Financial Protection Bureau
ATTENTION: Office of Enforcement
1700 G Street, N.W.
Washington D.C. 20552

## XXI.

## COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with

this Consent Order:

    170.   Within 14 days of receipt of a written request from the Bureau, Respondent

must submit additional compliance reports or other requested information, which must

be made under penalty of perjury; provide sworn testimony; or produce documents.

    171.   Respondent must permit Bureau representatives to interview any employee

or other person affiliated with Respondent who has agreed to such an interview. The

person interviewed may have counsel present.

Page 56 of 60

POUNDS EX 0717

172.    Nothing in this Consent Order shall limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

# XXII.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED**

173.    Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

174.    The Enforcement Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

Upon a written showing of good cause, the Enforcement Director may modify any provision of this Consent Order to the extent that compliance with that provision could cause Respondent, its Board, officers, or employees to violate any law, rule, or regulation, including but not limited to any subsequent amendments of the CFPA, FCRA, or FDCPA.

# XXIII.

## ADMINISTRATIVE PROVISIONS

175.    The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency from taking any other action against Respondent, except as described in Paragraph 176.

POUNDS EX 0718

176.    The Bureau releases and discharges Respondent from all potential liability
for law violations that the Bureau has or might have asserted based on the practices
described in Section IV of this Consent Order, to the extent such practices occurred
before the Effective Date and the Bureau knows about them as of the Effective Date. The
Bureau may use the practices described in this Consent Order in future enforcement
actions against Respondent and its affiliates, including, without limitation, to establish a
pattern or practice of violations or the continuation of a pattern or practice of violations
or to calculate the amount of any penalty. This release does not preclude or affect any
right of the Bureau to determine and ensure compliance with the Consent Order, or to
seek penalties for any violations of the Consent Order.

177.    This Consent Order is intended to be, and will be construed as, a final
Consent Order issued under Section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly
does not form, and may not be construed to form, a contract binding the Bureau or the
United States.

178.    This Consent Order will terminate 5 years from the Effective Date or 5 years
from the most recent date that the Bureau initiates an action alleging any violation of the
Consent Order by Respondent. If such action is dismissed or the relevant adjudicative
body rules that Respondent did not violate any provision of the Consent Order, and the
dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order
will terminate as though the action had never been filed. The Consent Order will remain
effective and enforceable until such time, except to the extent that any provisions of this

Page 58 of 60

POUNDS EX 0719

Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

179.   Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

180.   Should Respondent seek to transfer or assign all or part of its operations or assets that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

181.   The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFP Act, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

182.   This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

POUNDS EX 0720

183.    Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

SO ORDERED this _8th_ day of _September_, 2015.

_Richard Cordray_
Richard Cordray

Page 60 of 60

POUNDS EX 0721

# UNITED STATES OF AMERICA
# CONSUMER FINANCIAL PROTECTION BUREAU

**File No. 2015-CFPB-**0023

| | |
|---|---|
| In the Matter of:<br><br><br>Portfolio Recovery Associates, LLC, | **STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) intends to initiate an administrative proceeding against Portfolio Recovery Associates, LLC ("Respondent"), under 12 U.S.C. §§ 5563 and 5565, for violations of Sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a) and 5536(a)(1); Sections 807, 807(2)(A), 807(5), and 807(10) of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§1692e, 1692e(2)(A), 1692e(5), 1692e(10).

Respondent, in the interest of compliance and resolution of the matter, and without admitting or denying any wrongdoing, consent to the issuance of a Consent Order substantially in the form of the one to which this Stipulation and Consent to the Issuance of a Consent Order is attached (Consent Order), and which is incorporated by reference.



1

In consideration of the above premises, Respondent agrees to the following:

## Jurisdiction

1. The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the Consumer Financial Protection Act (CFPA), 12 U.S.C. §§ 5563, 5565.

## Consent

2. Respondent agrees to the issuance of the Consent Order, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondents and the subject matter of this action.

3. Respondent agrees that the Consent Order will be deemed an "order issued with the consent of the person concerned" under 12 U.S.C. § 5563(b)(4), and agree that the Consent Order will become a final order, effective upon issuance, and will be fully enforceable by the Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565.

4. Respondent voluntarily enters into this Stipulation and Consent to the Issuance of a Consent Order.

5. The Consent Order resolves only Respondent's potential liability for law violations that the Bureau asserted or might have asserted based on the practices described in Section IV of the Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. Respondent acknowledges that no promise or representation has been made by the Bureau or any employee, agent, or representative of the Bureau, about any liability outside of this action that may have arisen or may arise from the facts underlying this action or immunity from any such liability.

6. Respondent agrees that the facts described in Section IV of the Consent Order will be taken as true and be given collateral estoppel effect, without further proof, in any proceeding before the Bureau based on the entry of the Consent Order, or in any subsequent civil litigation by the

Bureau to enforce the Consent Order or its rights to any payment or monetary judgment under the Consent Order, such as a non-dischargeability complaint in a bankruptcy case.

7. The terms and provisions of this Stipulation and the Consent Order will be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.

8. Respondent agrees that the Bureau may present the Consent Order to the Bureau Director for signature and entry without further notice.

## Waivers

9. Respondent, by consenting to this Stipulation, waives:

   a. Any right to service of the Consent Order, and agrees that issuance of the Consent Order will constitute notice to the Respondent of its terms and conditions;

   b. Any objection to the jurisdiction of the Bureau, including, without limitation, under section 1053 of the CFPA, 12 U.S.C. § 5563;

   c. The rights to all hearings under the statutory provisions under which the proceeding is to be or has been instituted; the filing of proposed findings of fact and conclusions of law; proceedings before, and a recommended decision by, a hearing officer; all post-hearing procedures; and any other procedural right available under section 1053 of the CFPA, 12 U.S.C. § 5563, or 12 CFR Part 1081;

   d. The right to seek any administrative or judicial review of the Consent Order;

   e. Any claim for fees, costs or expenses against the Bureau, or any of its agents or employees, and any other governmental entity, related in any way to this enforcement matter or the Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to the Equal Access to Justice Act and the Small Business Regulatory Enforcement Fairness Act of 1996; for these purposes, Respondent agrees that Respondent is not the prevailing party in this action because the parties have reached a good faith settlement;

   f. Any other right to challenge or contest the validity of the Consent Order;

g. Such provisions of the Bureau's rules or other requirements of law as may be construed to prevent any Bureau employee from participating in the preparation of, or advising the Director as to, any order, opinion, finding of fact, or conclusion of law to be entered in connection with this Stipulation or the Consent Order; and

h. Any right to claim bias or prejudgment by the Director based on the consideration of or discussions concerning settlement of all or any part of the proceeding.

PORTFOLIO RECOVERY ASSOCIATES, LLC
By its Sole Member, PRA GROUP, Inc.
By:

_____                    Dated: September 3, 2015

Steven D. Fredrickson
Chairman and CEO of PRA GROUP, INC.

POUNDS EX 0725

NORTH CAROLINA
COUNTY OF WAKE

## **AFFIDAVIT OF COUNSEL (McNULTY)**
## **AUTHENTICATING CFPB DOCUMENTS**

Carlene McNulty, Esq., being duly sworn, deposes and says:

1. I am an attorney licensed to practice law in North Carolina. I give this affidavit in the
belief that it presents matters that are undisputed, as it solely concerns the authentication of two
documents that I personally obtained from the internet from the source described below.

2. I obtained a document titled "Consent Order" and bearing the caption "United States
of America Consumer Financial Protection Bureau, *In the Matter of: Portfolio Recovery
Associates, LLC*," case no. 2015-CFPB-0023, and bearing an execution date of September 3,
2015 and a filing date of September 9, 2015, on November 1, 2016, from the Internet website
maintained by the United States Consumer Financial Protection Bureau,
http://www.consumerfinance.gov/ by clicking on links for "Law and Regulation" and
"Administrative Adjudication," and in the 2015 Docket
(http://www.consumerfinance.gov/administrativeadjudication/) selecting "Administrative
Proceeding File No. 2015-CFPB-0023 – Portfolio Recovery Associates, LLC." The document
that appears as Exhibit 49 being filed in support of Plaintiffs' Motions for Preliminary Injunction
and Class Certification is a true and accurate copy of the Consent Order.

3. I obtained a document titled "Stipulation and Consent to the Issuance of a Consent
Order," and bearing the caption "United States of America Consumer Financial Protection
Bureau, *In the Matter of: Portfolio Recovery Associates, LLC*," case no. 2015-CFPB-0023, and
bearing an execution date of September 3, 2015 and a filing date of September 9, 2015, on



POUNDS EX 0726

November 1, 2016, from the same source referenced in paragraph 2 above. The document that appears as Exhibit 50 of the Exhibits in Support of Plaintiffs' Motions for Preliminary Injunction and Class Certification is a true and accurate copy of the Stipulation.

This, the 3rd day of November, 2016.

_____
**Carlene McNulty**

STATE OF NORTH CAROLINA
COUNTY OF WAKE

Subscribed and sworn to (or affirmed) before me,

this the 3 day of November , 2016.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires: 7·17·21 .

SEONAID A RIJO
Notary Public
Wake
County
My Comm. Exp.
07-17-2021
NORTH CAROLINA

-2-

POUNDS EX 0727